No. 15-3706

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

GLENN PATRICK BRADFORD )
       Petitioner-Appellant, )  Appeal from the Southern District
     v. )  of Indiana, Case No. 2:13-cv-410-
RICHARD BROWN, )  JMS-WGH
       Respondent-Appellee. )  Honorable Jane Magnus-Stinson,
  )  Judge Presiding
  )
  )
  )
  )
  )
  )

---

## PETITION FOR REHEARING EN BANC OF PETITIONER-APPELLANT
## GLENN PATRICK BRADFORD

---

Ronald S. Safer (Counsel of Record)
Deborah A. Bone
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison St., Suite 2900
Chicago, Illinois 60602
Phone:  (312) 471-8700
Fax:  (312) 471-8701
Email:  rsafer@rshc-law.com

*Attorneys for Petitioner-Appellant*
*Glenn Patrick Bradford*

Dated: August 17, 2016

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __15-3706__

Short Caption: __Bradford v. Brown__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

__Glenn Patrick Bradford__

_____

_____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

__Riley Safer Holmes & Cancila LLP__

__Schiff Hardin LLP__

_____

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

__n/a__

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

__n/a__

Attorney's Signature: __s/  Ronald S. Safer__          Date: __8/17/2016__

Attorney's Printed Name: __Ronald S. Safer__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes**  __X__    **No** _____

Address: __70 West Madison, Suite 2900, Chicago, IL 60602__

_____

Phone Number: __312-471-8700__          Fax Number: __312-471-8701__

E-Mail Address: __rsafer@rshc-law.com__

rev. 01/15 GA

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 15-3706

Short Caption: Bradford v. Brown

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Glenn Patrick Bradford

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Riley Safer Holmes & Cancila LLP

Schiff Hardin LLP

(3)    If the party or amicus is a corporation:

i)    Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

n/a

Attorney's Signature: s/ Deborah Bone    Date: 8/17/2016

Attorney's Printed Name: Deborah Bone

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** _____    **No** ✕

Address: 70 West Madison, Suite 2900, Chicago, IL 60602

Phone Number: 312-471-8700    Fax Number: 312-471-8701

E-Mail Address: dbone@rshc-law.com

rev. 01/15 GA

# <u>TABLE OF CONTENTS</u>

Page

STATEMENT PURSUANT TO FED. R. APP. P. 35(b) ................................................ 1

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

ARGUMENT ..................................................................................................... 9

I.      When Liability Turns on Specific Expertise, Retaining a General
        Expert Is Constitutionally Ineffective.............................................. 9

        A.      Bradford Lacked Expertise on the Critical Issue in the Case. .............. 9

        B.      Selecting Davie Was Constitutionally Ineffective Here. ........................ 9

        C.      Choosing an Incompetent Expert Is Constitutionally Ineffective. ........ 10

        D.      Bradford Was Prejudiced. ...................................................................... 10

II.     The Court Should Recognize a Freestanding Actual Innocence Claim. ......... 11

        A.      Bradford's Undisputed Evidence of Innocence Meets the Requisite
                "Extraordinarily High" Threshold Requirement of *Herrera v. Collins*.11

        B.      The Record Establishes Bradford's Innocence. ..................................... 12

        C.      The Panel Majority's Criticisms of the Undisputed, Objective Evidence
                of Innocence Are Misplaced.................................................................... 14

CONCLUSION.................................................................................................. 15

# TABLE OF AUTHORITIES

Page

## CASES

*Bradford v. State*,
    988 N.E.2d 1192 (Ind. App. Ct. 2012) ............................................................ 10, 11

*Bradford v. Brown*,
    No. 15-3706 (7th Cir. Aug. 4, 2016) ............................................................ *passim*

*Bunch v. State*,
    964 N.E.2d 274 (Ind. App. Ct. 2012) ................................................................ 4

*Carriger v. Stewart*,
    132 F.3d 463 (9th Cir. 1997) .......................................................................... 12

*Childs v. Entergy Mississippi, Inc.*,
    411 F. App'x 699 (5th Cir. 2011) .................................................................... 10

*Herrera v. Collins*,
    506 U.S. 390 (1993) ...................................................................... 1, 11, 12, 14

*House v. Bell*,
    547 U.S. 518 (2006) ................................................................................ 11, 12

*Jones v. Taylor*,
    763 F.3d 1242 (9th Cir. 2014) ........................................................................ 11

*Mathison v. Moats*,
    812 F.3d 594 (7th Cir. 2016) .......................................................................... 10

*Rogers v. Israel*,
    746 F.2d 1288 (7th Cir. 1984) .......................................................................... 2

*Schlup v. Delo*,
    513 U.S. 298 (1995) .................................................................................. 1, 11

*Strickland v. Washington*,
    466 U.S. 668 (1984) ................................................................................... 1, 3

*Thomas v. Clements*,
    789 F.3d 760 (7th Cir. 2015) .......................................................................... 10

*United States v. Krohn*,
    560 F.2d 293 (7th Cir. 1977) ........................................................................... 2

## STATEMENT PURSUANT TO FED. R. APP. P. 35(b)

The Panel affirmed Mr. Bradford's denial of habeas relief by a 2-1 vote.  But the distance between the majority and dissent was not one of nuance. As Judge Hamilton found in dissent, Mr. Bradford is "almost certainly innocent." The questions presented in this case must be evaluated in light of the fundamental importance of protecting actually innocent people from unjust incarceration. "[C]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system." *Schlup v. Delo*, 513 U.S. 298, 325 (1995). The Panel's decision addresses issues of exceptional importance and leaves the state of the law unclear.   Rehearing is needed to provide both uniformity to this Court's jurisprudence and justice to Mr. Bradford. The important questions warranting further review are:

1.      In a habeas corpus proceeding, was it constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for trial counsel to retain an expert who lacked competence to opine about critical issues in the case?

2.      Can objective evidence of innocence, undisputed in the record, form the basis for a freestanding "actual innocence" claim for habeas relief sufficient to remand for a new trial or evidentiary hearing?  If so, what constitutes a "truly persuasive showing of actual innocence" under *Herrera v. Collins*, 506 U.S. 390 (1993), sufficient to warrant freestanding habeas relief?

## INTRODUCTION

Nothing is more fundamental to our justice system than ensuring the freedom of innocent persons. Mr. Bradford is innocent:  objective record evidence

proves it. In his dissent, Judge Hamilton described some of this evidence before concluding that Mr. Bradford is "almost certainly innocent." *Bradford v. Brown*, No. 15-3706, slip op. at 32 n.7 (7th Cir. Aug. 4, 2016). Nonetheless, Mr. Bradford has been in prison for more than 22 years because his trial counsel made critical errors that precluded the jury from hearing the evidence that exonerates him. The Indiana Courts failed to correct these mistakes, in part because they in turn made factual and legal errors. The District Court repeated those errors in denying habeas relief. The Panel majority acknowledged some of the mistakes, but it attacked the evidence of Mr. Bradford's innocence with suspect information outside the record on appeal. This approach—using extra-record, independent research to undermine expert testimony without giving the expert an opportunity to respond—is anathema to our justice system. Unless this Court rehears this case *en banc*, Mr. Bradford will most certainly spend the rest of his life in prison without a jury ever hearing the scientific evidence that proves his innocence.

This petition presents two legal issues of exceptional importance. *First*, the standard for determining whether selecting an expert witnesses is constitutionally ineffective is unclear. To be sure, it is well settled that the failure to consult an expert concerning an important issue can be ineffective. *See, e.g., Rogers v. Israel*, 746 F.2d 1288, 1295 (7th Cir. 1984). But it is equally well settled that counsel's choice *of* an expert is generally a matter falling within trial strategy and accordingly not ineffective. *See, e.g., United States v. Krohn*, 560 F.2d 293, 297 (7th Cir. 1977). Between these poles, though, is a critical question presented here that

has gone unaddressed: Can trial counsel be constitutionally ineffective when they retain an expert who is well-qualified in the *general* field but who lacks competence to opine on a specific issue within that field upon which guilt or innocence turns? We believe the answer must be "yes." Picking from among a range of experts, each of whom is qualified to offer opinions about a core issue is strategic; picking an expert who lacks the necessary expertise is not. The reason is that cross-examination will utterly obliterate such an otherwise generally qualified expert, amounting to no expert testimony at all.

Here, trial counsel retained an expert, Barker Davie, who had extensive experience in the cause and origin of fires. And since this was a murder-arson case, it might appear at first blush that trial counsel's choice of Davie was strategic, falling outside the scope of *Strickland*. Liability in this case did not turn, though, on cause and origin. Rather, the key issue was the *duration* of the fire.

The undisputed evidence is that for Bradford to have been the killer, he had to have killed the victim's dog, set the fire, and called first responders in only 65 seconds. In light of these undisputed facts, how the fire started was never going to be the critical issue. Instead, the critical issue was always going to be how long the fire had burned by the time first responders put it out. If it had burned more than eight minutes, the State itself has conceded that Bradford is innocent.

Davie could not provide competent testimony about duration. Yet, rather than ask whether Davie was the right type of expert given these facts, the Indiana

courts, the trial court, and the Panel majority stopped their analysis after finding that Davie was a competent "fire" expert, albeit for cause and origin, not duration.

Because competence is judged objectively based on the state of knowledge at the time of trial (not with hindsight), it matters whether the necessary expertise was available then. If it was not, we agree that it cannot have been incompetent to fail to have called someone with later-arising expertise. Effective assistance has never required clairvoyance and we are not advocating for any such standard.

What we are advocating for — and indeed, what is essential to ensuring that criminal defendants receive constitutionally effective assistance of counsel — is a rule that recognizes that competence has always required an evaluation of the facts and circumstances in order to develop a defense strategy. There is nothing strategic or tactical about ignorance. Bradford's lawyers failed to call an expert on duration when the objective evidence *at the time of trial* showed (1) that duration was the key fact on which Bradford's guilt or innocence turned; (2) there were experts who could have testified about duration at the time of trial, testimony that surely would have aided the trier of fact; and (3) Davie was not a duration expert — indeed, his only opinion even touching on duration relied on a heuristic that was discredited more than a year before trial by the national standard setting organization.

There is no clear guidance whether habeas relief is available when trial counsel picks the wrong kind of expert. The issue arises frequently, but none more so than in arson cases, where the revolution in fire investigation science is well documented. *See, e.g., Bunch v. State,* 964 N.E.2d 274, 288-90 (Ind. App. Ct. 2012).

The bench and bar need clarity from this Court.

*Second*, there must be a freestanding innocence claim in federal habeas corpus. The Supreme Court has left open whether habeas provides such a claim and, if so, the burden of proof. How can the greatest justice system in the world deny relief to imprisoned persons who are "almost certainly" innocent? No circuit has ruled conclusively that there is a freestanding innocence claim. This case provides that opportunity and it warrants attention from the Court *en banc*.

## BACKGROUND

The State argued and the evidence shows that Ms. Lohr was killed at night or in the morning and that her murderer set a fire to conceal the crime. All agree that a single person committed the murder and the arson. Three critical, undisputed times make it impossible for that person to have been Bradford because it was impossible for him to have set the fire. He was more than two blocks from Lohr's house at 6:34:04 a.m.[1] (T 896.)[2] He reported the fire at 6:35:09 a.m., 65 seconds later. (T 830-33.) It was extinguished by 6:43:19 a.m. (T 1115-16; 1993.) Bradford is innocent if either of two things is true: (1) the fire burned longer than eight minutes or (2) he could not in 65 seconds have completed the trip to the house and done everything the arsonist must have done.

---

[1] A bank's camera photographed Bradford's car more than two blocks from Lohr's house. The window for Bradford to set the fire was so small that it was established through an "adjusted" set of times, using "atomic time [of the] Naval Academy out of New York." (T 828-29; 905.)

[2] Citations to the record are in the following form: "T" refers to the transcript page of the criminal trial. "Supp. R." refers to the transcript page of the remand hearing. "PCR" refers to the record pages of the post-conviction proceeding record. "A__" refers to the page number in Petitioner-Appellant's Appendix.

## The 65 Seconds

The State's case rested on testimony from Detective Minnis that Bradford could have driven to the house, parked his car, gotten out of his car, entered the house, picked up a gas can, splashed gasoline on Ms. Lohr and around the room (without getting a trace of it on himself), ignited it, and called in the fire within 65 to 70 seconds.[3] (T 2567-76.) Accordingly, by the State's own evidence, the shortest end of the range consumed every second available to Bradford. What the jury did not hear, because defense counsel retained the wrong expert, was that there were additional tasks that the real arsonist performed that morning. Lohr's dog was stabbed twice and beaten about the eye. (T 1369-73.) The State theorized this was accomplished at night, because Bradford had no time to commit these acts in the morning. The expert testimony at post-conviction, however, makes clear that the dog was *alive* in the morning because it had an elevated carboxyhemoglobin ("COHb") level, meaning it was alive *when the fire was set*. (PCR 193-94.) The Panel majority agreed with this critical fact, but attached no significance to it: "Nor would it take long to stab a small poodle twice." Slip Op. at 2, 9. Neither the record nor common sense supports the majority's factual finding that it would not take long to kill the dog. It would take *some* time to secure the dog, beat it, stab it twice,

---

[3] This experiment was flawed. Minnis walked briskly from his car to the door (T 2569) without pausing for a waiving neighbor, as Mr. Bradford indisputably did. (T 3412-13.) He did not splash actual liquid; he "mimed" the pouring of the gas. (T 2573-74.) Thus, he did not take the time to ensure he had no gas on him. (Bradford's uniform was tested and contained no gas. (T 2020-21; 2042-43.)) Sixty-five to 70 seconds, therefore, was the absolute minimum it would take someone to complete the tasks that Minnis performed.

and conceal the knife.[4]   Even if it took a few seconds, those seconds exonerate Bradford. In trying to prove Bradford's opportunity to commit the crime, the State used all available 65 seconds, yet excluded securing, beating, and killing the dog, let alone concealing the knife, from its timeline. This unequivocally proves Bradford's innocence. The jury never heard the evidence because trial counsel did not retain an expert who, like the post-conviction expert, could tell the jury that the dog was alive, adding its murder to the timeline. Bradford was constitutionally entitled to have counsel who would have shared this critical information with the jury.

## The Eight Minutes[5]

The fire's duration independently proves Bradford's innocence. If it burned longer than eight minutes, Bradford could not have set it. Defense counsel neither consulted nor retained a witness who could provide fire duration testimony. Instead, trial counsel picked a cause and origin expert when neither cause nor origin was disputed. According to the Panel majority, "there is no support" for Bradford's contention that "Davie was not an expert on fire duration." Slip Op. at 10. In fact, direct and indirect record evidence supports the contention. In his deposition, Davie testified that he had no way of determining the fire's duration. (PCR 215.) Yet the post-conviction expert testified that there were myriad objective methods for determining the fire's length; Davie simply lacked the necessary expertise. His trial

---

[4] Although Bradford was with police officers from virtually the time he called in the fire, no knife was found.  Nor was there any blood on his uniform. (T 1608; 2450-52.) To be the arsonist, he needed to have hidden the knife.  That is impossible.

[5] In dissent, Judge Hamilton explored the evidence of the fire's duration accurately and persuasively.  Slip Op. at 12-37. This is merely an abbreviated summary.

testimony confirmed this. He pointed to two pieces of evidence that the fire lasted more than eight minutes: (1) an eyewitness smelled smoke from Lohr's house well before Bradford had even left the police station (T 2931-37; 3094-99; 3121-24), and (2) a statement in National Fire Protection Agency ("NFPA") 921 — the acknowledged industry-standard for fire investigations — supposedly providing a rule of thumb for a char rate for wood. (A door panel separating the front room from the bedroom, as well as the closet door, had burned through. (T 3085-86.)) Applying the rule of thumb, Davie said it would have taken 15 minutes for the door to burn though. (*Id.*)

While the first piece of evidence was powerful, it took no expertise. (T 3950-51.) Neither did the second — it required only a calculator. But the second was more problematic and Davie would have known it was if he was competent about fire duration: the very source he cited, NFPA 921, expressly stated that this rule of thumb was unreliable. NFPA 921, 4-5.2 (1992). Davie's credibility was devastated by this impeachment. (T 3822-23.)

At the post-conviction phase, counsel retained a nationally recognized fire science expert, Doug Carpenter, who calculated the fire's length using controlled experiments and scientific principles. Using three independent methods — char rate of the doors; complete consumption of the mattress; and the dog's COHb level — he established a 30-minute minimum duration. Bradford could not have set it.[6]

---

[6] While the Panel majority took issue with Carpenter's analyses (using evidence never explored with Carpenter, and, for the most part, not in the record), its error is not the reason for *en banc* review. The reason is that Bradford is innocent and the law governing

<u>ARGUMENT</u>

I.    **When Liability Turns on Specific Expertise, Retaining a General Expert Is Constitutionally Ineffective.**

A.    **Bradford Lacked Expertise on the Critical Issue in the Case.**

Davie admittedly lacked fire duration expertise. (PCR 215.)  In summarizing his testimony, the State noted that it was nothing more than "if [the] smell of smoke happened before Patrick Bradford got there, then Patrick Bradford didn't set the fire. Well, you don't need to pay someone $125 an hour to tell you that. I think you all could have figured that out very easily by yourself." (T 3950-51.)

B.    **Selecting Davie Was Constitutionally Ineffective Here.**

Davie's testimony was worse than a net zero; the defense *lost* credibility. Using a char rate heuristic published by NFPA 921, Davie testified that it would have taken 15 minutes for the door to burn through. (T 3085-86.)  The State eviscerated this testimony and the defense's credibility by showing that NFPA itself stated that this heuristic was unreliable. NFPA 921, 4-5.2 (1992); (T 3822-23).

The Panel majority held that the Indiana Court of Appeals "can't be said to have erred" in ruling that the choice of Davie was ineffective. Slip Op. at 10. But both the Indiana courts and the District Court based their findings on a mistake of fact, stating that the NFPA "did not discard the burn-through standard used by Davie until early 1992, *only a few months before trial*;" that Braford's attorneys were not "required to be as well informed in fire investigation science as the experts;" and they were accordingly not ineffective "by being unaware of this change

_____

ineffective assistance regarding the selection of experts is unclear.  Nonetheless, a jury should hear this critical expert testimony.

and by continuing to use Davie's services." *Bradford v. State*, 988 N.E.2d 1192, 1204 (Ind. App. Ct. 2012) (emphasis added).[7]  In fact, the trial began June 1, 1993, more than 14 months after NFPA repudiated the rule of thumb. (T 765.) No one was caught unaware; counsel simply chose the wrong expert.

### C.    Choosing an Incompetent Expert Is Constitutionally Ineffective.

When does picking the wrong kind of expert amount to picking no expert at all?  At one end, there is no question that failing to consult an expert, when expert testimony is necessary, can be constitutionally ineffective. *See, e.g.*, *Thomas v. Clements*, 789 F.3d 760, 769-70 (7th Cir. 2015). At the other end, picking a generally competent expert says nothing about whether they are qualified to opine about specifics.  *See, e.g., Mathison v. Moats*, 812 F.3d 594, 597 (7th Cir. 2016) (prison doctor not qualified to testify as cardiology expert); *Childs v. Entergy Mississippi, Inc.,* 411 F. App'x 699, 701 (5th Cir. 2011) (electrician not qualified to testify regarding high-voltage systems).  We believe that the rule for federal habeas must be that when liability turns on a specific issue of expertise, picking a general expert who lacks that expertise is tantamount to picking no expert at all.

Under this rule, Bradford is entitled to habeas relief.  Davie was a general fire expert, but he lacked expertise to testify about duration.  Worse, the duration opinion he tried to offer established his ignorance concerning duration.

### D.    Bradford Was Prejudiced.

As set forth in detail below, Carpenter's expert testimony exonerates

---

[7] The district court repeated this error. (A32.) Both courts adopted the State's repeated mischaracterization of this evidence. (*See, e.g.,* ECF No. 26 at 25.)

Bradford.  He establishes that the dog must have been killed in the morning, and thus, that Bradford had no time to set the fire.  He also establishes that the fire burned for at least 30 minutes, eliminating Bradford as the possible arsonist.

The Indiana Court of Appeals found that all of this testimony was available to trial counsel at the time of trial. *Bradford*, 988 N.E.2d at 1200. Had it been given at the time of trial, Bradford certainly would have been found not guilty.

## II.  The Court Should Recognize a Freestanding Actual Innocence Claim.

"[T]he individual interest in avoiding injustice is most compelling in the context of actual innocence. . . . [It is a] fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *Schlup*, 513 U.S. at 324-25 (internal quotations omitted).

### A.  Bradford's Undisputed Evidence of Innocence Meets the Requisite "Extraordinarily High" Threshold Requirement of *Herrera v. Collins*.

Bradford has presented the evidence required to establish a freestanding claim of actual innocence under *Herrera v. Collins*.  In *Herrera*, the Court assumed without deciding the validity of an actual innocence claim if a prisoner could meet an "extraordinarily high" threshold; the Court has never articulated a standard of review. 506 U.S. at 417, *House v. Bell*, 547 U.S. 518, 554 (2006).  In dissent, Justice Blackmun proposed the following standard: a petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt and must affirmatively prove that he is *probably* innocent. *Herrera*, 506 U.S. at 442-44 (Blackmun, J., dissenting); *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014)

(Petitioner "must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.").

Judge Hamilton describes Bradford's case as "appropriate for an actual innocence grant of habeas corpus." Slip Op. at 37. Indeed, after reviewing Bradford's case in its entirety, Judge Hamilton concluded that Bradford is "*almost certainly* innocent." Slip Op. at 32 n.7 (emphasis added).

Given the overwhelming evidence that the State's trial case is beyond improbable and resulted in the conviction of an innocent person, Bradford urges this Court to recognize what Judge Hamilton did: that *Herrera* established the possibility of a freestanding innocence claim when a habeas petitioner meets the requisite "extraordinarily high" threshold; and that Bradford has met that threshold and deserves immediate relief.

## B.    The Record Establishes Bradford's Innocence.

None of the *Herrera* line of cases included the objective evidence of innocence that Bradford has here. *See*, *e.g.*, *Herrera*, 506 U.S. at 417 (hearsay affidavits insufficient); *House*, 547 U.S. at 553-54 (new testimony showing that forensic evidence did not link petitioner to crime insufficient when other inculpatory evidence remained); *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997) (third-party confession insufficient when stories were contradictory and third party had documented history of lying). Here, innocence can be proved.

With an innocent defendant, we would expect no physical evidence proving guilt.  That is true here:  there is no forensic evidence, eyewitness implication, or other direct evidence. Indeed, the State's case is unlikely in every respect. Bradford

had only an hour of unaccounted for time during the evening. It is, at best, implausible that he could have left his shift, stabbed Ms. Lohr more than 20 times without getting a drop of blood on him, and seamlessly returned to work.[8]

Similarly, there is no evidence Mr. Bradford returned after his shift to commit the arson. As discussed above, the evidence that he did not have time to commit the crime in 65 seconds is unrefuted by record evidence. The State based its entire case on Minnis' flawed timing experiment which, even if credited, failed to include killing the dog. Carpenter's testimony that the dog was alive when the fire was burning, evidenced by its elevated COHb level, is unrebutted. (PCR 188-93; 241-42; 271.) Even the Panel majority agreed that the dog was alive when the fire burned. That excludes Bradford. Tragically, the jury did not know that the timeline that otherwise gave them so much trouble was incomplete.[9]

While this proves Bradford innocent, there is more. If the fire burned for more than eight minutes, Bradford could not have set it. Carpenter's testimony, discussed in detail in the dissent, proves the fire burned at least 30 minutes based upon three independent factors: (1) the char rate of the door, (2) the complete consumption of the mattress, and (3) the dog's COHb level. Each proves Bradford's

---

[8] Concluding that Bradford could have done so requires ignoring a neighbor's uncontradicted testimony that Ms. Lohr's lights were on in the early morning hours, well after any window closed for Bradford to have been the murderer. (T 2362-64.) The "motive" evidence proves only that Bradford was unfaithful, something his wife testified she knew (she also told him that she wouldn't leave him). (T 3286-87; 3302-06.) Bradford had no reason to kill Ms. Lohr.

[9] The timeline was critical to the jury. During deliberations, the jury asked to visit the scene again and jurors conducted their own experiments to test the timeline. (Supp. R. 242-245.)

innocence, as elicited at the post-conviction hearing.[10]  The State offered no counter evidence, nor did it seriously challenge this testimony in cross examination.

*Herrera* suggests an extraordinary high threshold to show actual innocence. Justice Blackmun and the Ninth Circuit suggest a showing that the petitioner is probably innocent.  Independent scientific analyses proving Mr. Bradford could not have committed this crime should be more than sufficient to pass this threshold. This is not a case of tardy witness affidavits, or memories potentially tainted by time. Nor is it a case of one piece of inculpatory evidence being called into question while others remain. This is a case of science affirmatively proving innocence. And, thus far, our justice system has failed to remedy this grave injustice.

### C.     The Panel Majority's Criticisms of the Undisputed, Objective Evidence of Innocence Are Misplaced.

The Panel majority challenged parts of Carpenter's testimony based largely on extra-record evidence. While the challenges are without merit, the Court should hear this case *en banc* not simply to correct these errors. Instead, it should reject this practice, particularly in criminal cases when actual innocence is the issue. Cross-examination is the way to test Carpenter's opinions. Carpenter never had the opportunity to hear, let alone respond to, these challenges.  For example, he pointed to the failure of the windows to break as a factor in determining the maximum temperature of the room. Slip Op. at 5-6. The Panel majority took issue with

---

[10] Eyewitnesses corroborated Carpenter's expert testimony. A newspaper carrier testified he smelled smoke as he approached Ms. Lohr's house before Bradford had even passed the bank camera. (T 2931.)  And joggers testified that they saw thick smoke — which would have taken time to build up — only 90 seconds after Bradford passed the camera.  (T 900-906; 2277-82.)

Carpenter's analysis because the temperature near the floor of a room is lower than at the ceiling, citing evidence not in the record. *Id.* Carpenter, an acknowledged expert, specifically opined that "the thermal exposure to the front bedroom window and the top portion of the side bedroom window, produced by immersion in the hot upper layer, would be similar to the thermal exposure to the top panels of the bedroom and bedroom closet doors." (A140.) That expert testimony is unrebutted by record evidence. The general principle cited by the Panel majority may be true of a typical fire, but it is inapplicable to the fire at issue in this case.[11]

The Panel majority's questions about Bradford's post-conviction evidence have never been submitted to Carpenter, or, for that matter, any expert. In essence, the Panel majority offered evidence that Bradford has never had the opportunity to confront: his expert has never had the chance to explain why the Panel majority's concerns about the facts are misplaced. Due Process surely requires more. The scientific legitimacy of the various challenges that the Panel majority made to the post-conviction evidence should be tested, not simply assumed to be correct.

## CONCLUSION

For the foregoing reasons, Mr. Bradford respectfully petitions the Court for a rehearing *en banc* of the Panel's decision.

Dated: August 17, 2016

    /s/ Ronald S. Safer

---

[11] Carpenter has reviewed the challenges to his testimony made by the majority and has responses to each. This was a ventilation-controlled fire and many of the principles articulated by the majority have limited or no application here. There are other flaws in the majority's fire science analysis. If it would be helpful, Carpenter would provide the Court with an affidavit or even testimony. Obviously, that is unusual. But so is reliance by a Court of Appeals on non-record evidence to evaluate a defendant's innocence.

RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison St., Suite 2900
Chicago, Illinois 60602
Phone:  (312) 471-8700
Fax:  (312) 471-8701
Email:  rsafer@rshc-law.com
*Attorneys for Petitioner Glenn Patrick*
*Bradford*

## <u>CERTIFICATE OF COMPLIANCE</u>

       The undersigned certifies that this petition conforms to the rules contained in Fed. R. App. P. 32(A)(7) and Fed. R. App. P. 35(b)(2).  The undersigned certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Century 12 point font.

Dated:  August 17, 2016

                         /s/ Ronald S. Safer
                        RILEY SAFER HOLMES & CANCILA LLP
                        Three First National Plaza
                        70 West Madison St., Suite 2900
                        Chicago, Illinois 60602
                        Phone:  (312) 471-8700
                        Fax:  (312) 471-8701
                        Email:  rsafer@rshc-law.com

                        *Attorneys for Petitioner Glenn Patrick Bradford*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 17, 2016, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will cause an electronic

copy to be served on counsel of record, who are listed below:


      Henry A. Flores, Jr.
      INDIANA ATTORNEY GENERAL
      302 West Washington Street,
      Indiana Government Center South
      Fifth Floor
      Indianapolis, IN 46204
      317-233-1665
      Email: henry.flores@atg.in.gov

Dated:  August 17, 2016

                  _/s/ Ronald S. Safer_____
                  RILEY SAFER HOLMES & CANCILA LLP
                  Three First National Plaza
                  70 West Madison St., Suite 2900
                  Chicago, Illinois 60602
                  Phone:  (312) 471-8700
                  Fax:  (312) 471-8701
                  Email:  rsafer@rshc-law.com

                  *Attorneys for Petitioner Glenn Patrick*
                  *Bradford.*

No. 15-3706

---

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

GLENN PATRICK BRADFORD )
      Petitioner-Appellant, ) Appeal from the Southern District
    v. ) of Indiana, Case No. 2:13-cv-410-
RICHARD BROWN, ) JMS-WGH
      Respondent-Appellee. ) Honorable Jane Magnus-Stinson,
 ) Judge Presiding
 )
 )
 )
 )
 )
 )

---

## APPENDIX – AUGUST 4, 2016 PANEL DECISION

---

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3706

GLENN PATRICK BRADFORD,

*Petitioner-Appellant,*

*v.*

RICHARD BROWN, Superintendent,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:13-cv-00410-JMS-WGH — **Jane E. Magnus-Stinson**, *Judge.*

ARGUED APRIL 14, 2016 — DECIDED AUGUST 4, 2016

Before POSNER, KANNE, and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* In 1993 Glenn Bradford was con-
victed in an Indiana state court of a murder and arson com-
mitted in Evansville the previous year, and was sentenced to
80 years in prison, where he remains. In 2013 he filed this
federal habeas corpus suit, in which he claims that he can
prove his innocence. He asks for a new trial, which the dis-
trict judge denied, precipitating this appeal.

Bradford, an Evansville police officer, was involved in an extramarital affair with a woman named Tamara Lohr. After his wife discovered the affair, Bradford decided to end it; but Lohr resisted, emailing him that if he left her she'd tell his wife the affair was continuing.

At 6:35 a.m. on a day a month or so after Lohr's threats and just after Bradford had finished a night shift, he reported a fire at Lohr's house. He told the responders that he'd entered the house to try to extricate her but had been unable to do so and believed she was dead. A firefighter had driven by the house at 6:30 a.m. and seen no signs of fire, but shortly after Bradford reported it the firefighter entered the house, extinguished the fire, and found Lohr's corpse on her bed. He estimated that the fire had started only a few minutes before he arrived. Fire investigators found in Lohr's bedroom an empty gasoline can from which gasoline had been poured onto the mattress on which Lohr's body lay and onto the floor between the mattress and the bedroom door. They inferred that the gasoline had been ignited by someone standing in the bedroom doorway. Lohr, it was discovered, had been stabbed to death and her body had been burned after she died. Her poodle was found dead, also with stab wounds, in the living room, which was just outside the bedroom, but we'll see that the dog was still alive when the fire started. From the conditions of the house and grounds the police concluded that the arsonist-murderer had staged a burglary rather than broken into the house.

Although the exact time of Lohr's death could not be determined, the state believed that she'd been stabbed during the night. Suspicion quickly focused on Bradford, who appears to have concealed his whereabouts on the fatal night

and thus could have murdered Lohr sometime during his night shift before returning in the morning to set the fire. He had no alibi for the period from about 11 p.m. to midnight. He claimed in an entry in his police activity log to have responded during that period to a hit and run accident, but the officer working that accident testified that he hadn't seen Bradford at the accident scene—while an Evansville police car that could have been Bradford's had been seen outside Lohr's house at about 11 p.m. The evidence presented at the trial included not only Bradford's seeming attempt to invent an alibi but also an attempt by him to delete Lohr's threatening emails to him a couple of hours after the fire.

Although only 65 seconds elapsed between when a bank camera revealed Bradford two blocks from Lohr's house and driving toward it and when he reported the fire, an investigator testified at trial that that was enough time for Bradford to have driven to the house, entered, spread the gasoline, and lighted it.

At trial, rival fire experts testified for the state and the defense about whether the fire had to have burned for more than eight minutes, in which event Bradford would have had a solid alibi because the fire was extinguished by 6:43:19 a.m. and he could not have set it before 6:35 given that he was seen by the bank camera two blocks away at 6:34:04 and that it would have taken him about a minute to reach the house from there, start the fire, and then call emergency services (which he did at 6:35:09)—and he'd been on police duty until about 6:30. No gasoline had been found on Bradford's uniform and the police had failed to investigate another possible suspect—a man who had lost his job as a jailer for the Sheriff's department after Lohr accused him of sexual

harassment, and whom she had subsequently reported to the police for parking outside her house in the middle of the night. There is, however, no evidence connecting that man with the arson or murder.

Bradford was convicted by a jury of murder and arson, and his conviction was upheld in *Bradford v. State*, 675 N.E.2d 296 (Ind. 1996), and his request for state post-conviction relief denied in *Bradford v. State*, 988 N.E.2d 1192 (Ind. App. 2013). He principally argues in the present proceeding that he couldn't have been the arsonist (and if not, then presumably not the murderer either) because his expert witnesses testified that the fire must have burned for more than eight minutes. If that's true Bradford could not have been the person who set the fire because, the reader will recall, eight minutes was the maximum time that the fire if set by Bradford would have lasted. Although his expert witness at trial testified that the fire had burned for 15 minutes, his principal expert witness in the post-conviction proceedings, Douglas Carpenter, went further, testifying that the fire must have burned for at least 30 minutes before it was extinguished. He based that estimate on his inspection of burned and unburned wood and other materials in the house and on the level of carboxyhemoglobin (COHb) in the poodle's blood—a house fire generates carbon monoxide (CO) that can combine with hemoglobin, a constituent of blood.

Bradford relies on three facts asserted by Carpenter to support his contention that the fire must have lasted more than eight minutes: (1) the time it would have taken the fire to burn through the upper panel of the bedroom door; (2) the time it would have taken for the poodle to have accumulated the amount of COHb found in its blood; and (3) the

time it would have taken the fire to consume the mattress on Lohr's bed. These facts don't make a case. Carpenter was unable to prove that the fire would have taken too long to burn through the upper panel of the bedroom door for Bradford to have set it. He conducted experiments under conditions that simulated a maximum temperature near the bedroom ceiling of 350°C. But the fire might well have been hotter than that. He contended that because none of the 12 panes of glass in the front bedroom window was broken, the room temperature near the ceiling (and thus near the top door panel) must have been below 280°C, and at that temperature it would he claimed have taken at least 30 minutes for the bedroom door to char through. He based this temperature claim on a study reported by Vytenis Babrauskas, "Glass Breakage in Fires" 2–3, www.doctorfire.com/Glass Break.pdf (visited Aug. 2, 2016), of the probability of glass breakage at different temperatures. That study had been limited to glass three millimeters thick, and he admitted not knowing the thickness of Lohr's windows, though he testified that three-millimeter glass is "typical."

He claimed that because none of the 12 panes of glass was broken, the temperature near the ceiling of Lohr's room must have been below 280°C. That was the temperature at which the three-millimeter glass in the study on which he relied had a one-in-twelve probability of breaking. But a one-in-twelve *probability* of breakage at a particular temperature does not mean that if there are twelve panes one of them is certain to break, and Carpenter failed to justify his assumption that the more panes in the unbroken window, the lower the temperature had to have been. Moreover, he had no evidence that all the windowpanes had been exposed to the same temperature as the ceiling and the top panel of

the door. In a normal room fire the highest temperature is at the ceiling and the temperature near the floor is much lower. See T. J. Shields, *et al.*, "Performance of a Single Glazing Assembly Exposed to Enclosure Corner Fires of Increasing Severity," 25 *Fire & Materials* 123, 125–26 (2001).

His testimony that the top panel of the door would have required about 11 minutes to char through even if the fire's temperature had reached (though it hadn't) 600°C (measured just below the ceiling, where the fire would have been at its hottest) misrepresented his own report, according to which the 11-minute estimate was based on the heat flux (the rate at which heat energy passes through a given surface per unit of time) that would have been produced at a near-ceiling temperature of 350°C. And as we said, Carpenter didn't test char-through times for heat fluxes corresponding to temperatures higher than 350°C, even though the fire in Lohr's house may have been hotter than that.

There was also no basis for his conclusion that it would have taken 30 minutes for the fire to have caused the COHb level discovered in the poodle's autopsy. That estimate was based on the rate of carbon-monoxide uptake for an adult human being at rest, and such an estimate is not valid for a fifteen-pound dog who may moreover as we noted have been moving around in the presence of the fire. (What is clear, however, is that the poodle was alive when the fire started, because the only possible source of the elevated COHb found in its blood was inhalation of carbon monoxide (CO) produced by the fire.) Carpenter's own source explained that the uptake rate is significantly higher for smaller bodies and bodies in motion. David A. Purser, "Assessment of Hazards to Occupants from Smoke, Toxic Gases,

and Heat," *The SFPE Handbook of Fire Protection Engineering* 2–116 (4th ed. 2008).

The fire duration that he inferred from the poodle's COHb level was further inflated by his use of carbon-monoxide concentrations measured outside closed doors. The door to Lohr's bedroom was open by about an inch because of clothing jammed into the opening, and so the dog, who was a small distance outside the bedroom, would have breathed more carbon monoxide from the fire raging in the bedroom than had the door to the bedroom been closed.

Carpenter concluded that Lohr's mattress must have been completely consumed before the door charred through, for had it been consumed afterward additional air ventilation caused by the fire burning a hole in the door panel would have interacted with the mattress (fuel for the fire) to cause the fire to reach flashover conditions. Flashover conditions occur when the upper layer of gas in a room becomes hot enough (approximately 500°C to 600°C) to ignite all available combustible surfaces. Since it is undisputed that the room did not reach flashover, Carpenter concluded that the mattress must have been completely consumed *before* the door charred through. He used studies of rates of mass loss for flexible polyurethane foam (the material in Lohr's mattress) to predict what the mass loss rate would be in a room on fire with the door open one inch. Estimating the maximum duration of the fire as two hours and the minimum as 30 minutes, he concluded that the fire must have been started between 4:30 and 6:00 a.m.

Bradford infers from this that it would have taken two hours for Lohr's mattress to be consumed, and so the fire must have lasted at least that long. But two hours was Car-

penter's estimate of the *maximum* time for the mattress to be consumed. His estimate of the minimum time (30 minutes) if it were correct would exonerate Bradford, but the reliability of that estimate was undermined by the errors, discussed earlier, in Carpenter's testimony and report.

Two officers who appeared at the fire scene three minutes after Bradford had arrived reported that smoke was coming from the eaves of the house. Carpenter argues that smoke couldn't have come from the eaves until after the door had charred through because until then smoke would have gone out through the roof vents rather than sideways through the eaves. After the door charred through, however, the roof vents would be inadequate to vent all the smoke emerging from the bedroom and therefore smoke would go through the eaves as well as the vents. If Carpenter is correct, then, for Bradford to have been the arsonist, the fire had to have started, the door must have charred through, and smoke from the eaves must have appeared—all within three minutes of Bradford's arrival at the house, since responders to the fire arrived three minutes after Bradford and observed smoke upon arrival. But as we've said, the char-through time if the fire was hotter than 350°C is unknown and we also don't know how fast the smoke would have moved through Lohr's house and out the eaves and roof.

It's true that two joggers saw smoke coming from Lohr's house at 6:36:07, about a minute after Bradford called emergency services and two minutes after he was recorded by the bank camera driving toward the house. Carpenter claimed that the joggers' testimony corroborated his conclusion that Bradford could not have been the arsonist, since it is unlikely that Bradford would have been able to set the fire in time for

it to emit visible smoke in fewer than two minutes. But this argument does not appear in Bradford's briefs and the state's expert witness testified that smoke would have been visible outside the house within a minute after the fire was set.

Bradford further argues that the evidence that he could have reached Lohr's house and set the fire within 65 seconds (between 6:34:04 when he was photographed by the bank camera and 6:35:09 when he called emergency services) did not account for the time required for the murderer-arsonist to carry the gas can from the back porch to Lohr's room, turn off the electrical breakers, and stab the poodle. Not so. Although Lohr normally kept her gas can on the back porch, there is no evidence that it was there when the arsonist arrived that morning. Had Bradford brought it inside during his visit to Lohr between 11 p.m. and midnight, he could have used it at 6:34 a.m. without having to fetch it from the porch. And he would have needed to turn off the electrical breaker in the morning only if Lohr's neighbor was correct that he saw her light on at 12:30 a.m. That neighbor acknowledged, however, that he was estimating the time and had not been looking at a clock, so Bradford may have turned off the breaker earlier. Nor would it take long to stab a small poodle twice. The jury thus could reasonably find that 65 seconds was enough time for Bradford to arrive at Lohr's house and complete all the tasks that the evidence indicated had been completed by the murderer-arsonist.

Faced with "a request for an evidentiary hearing" to determine whether a convicted defendant should be given a chance to prove his innocence in a habeas corpus proceeding, "the District Court must assess the probative force of the

newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup v. Delo*, 513 U.S. 298, 331–32 (1995). Bradford had his chance and failed to present reliable evidence that would establish his innocence of the arson and murder.

Changing course, Bradford argues that his trial counsel was ineffective in deciding to retain a fire expert named Barker Davie, who co-owned a fire-investigation business, attended training programs and wrote articles, and had testified many times as a fire and arson expert for the state—experience that gave him particular credibility as a defense witness. Although Bradford claims that Davie was not an expert on fire duration, there is no support for that claim. According to Bradford, Davie's testimony that the fire lasted about 15 minutes (and definitely more than 9 minutes, so that Bradford could not have set it), though favorable to Bradford, was not convincing, because he utilized a wood-charring rate that the National Fire Protection Association had warned was not universally applicable as it was "based on [only] one set of laboratory conditions."

The Indiana Court of Appeals can't be said to have erred in holding that Bradford's trial counsel did not render ineffective assistance to his client by selecting Davie as a witness. See *Strickland v. Washington*, 466 U.S. 668, 687–91 (1984). He was a qualified and well-regarded fire expert who offered a defensible though not definitive estimate of the fire's duration. It was not a case in which counsel made no meaningful investigation or failed to present a defense expert on a critical issue. See, e.g., *Thomas v. Clements*, 789 F.3d 760, 768–69 (7th Cir. 2015); *Richey v. Bradshaw*, 498 F.3d 344, 362–63

(6th Cir. 2007); *Dugas v. Coplan*, 428 F.3d 317, 328–34 (1st Cir. 2005).

Bradford's final claim is that his right to a fair trial was violated because the jurors visited Lohr's house and timed whether Bradford could have set the fire in 65 seconds. Assuming that such an experiment was conducted (different jurors made contradictory reports of the matter), it was lawful because the jury was merely using its common sense to evaluate a timing issue critical to the case, and there has been no showing that it created an unacceptable risk of an incorrect verdict. See *Kurina v. Thieret*, 853 F.2d 1409, 1413–14 (7th Cir. 1988).

The judgment denying habeas corpus is

AFFIRMED.

HAMILTON, *Circuit Judge*, dissenting. Petitioner Bradford has come forward with powerful evidence of both his innocence and his trial lawyers' ineffective assistance in dealing with the critical scientific issue—the duration of the fire in Tamara Lohr's bedroom. The State and the courts upholding Bradford's convictions have not yet offered a plausible theory to account for the physical evidence of the fire and the time Bradford supposedly set it.

Instead, to rebut the scientific foundation for Bradford's petition for a writ of habeas corpus, the majority has struck out on its own with some modest criticisms based on the majority's own research and analysis. Those criticisms do not undermine the conclusion that Bradford could not have been the arsonist and murderer. Bradford and his key post-conviction expert also have not had an opportunity to respond to even these modest criticisms. Rather than affirm the denial of relief for Bradford based on these untested critiques, we should order a new trial to test all the relevant evidence. I respectfully dissent.

The scientific issue requires close attention to the timing of Bradford's actions, to the physical details of the fire and the damage it caused, and to objective information about fire behavior. I cannot offer the reader a shortcut, but I can offer a roadmap. Part I lays out the critical facts about the murder and fire: in I-A, the timing of Bradford's movements and the fire, in I-B the State's theory for Bradford's guilt, and then in I-C the key physical evidence. Part II turns to the law and how Bradford's otherwise able counsel provided ineffective assistance by failing to present available and credible expert testimony on the critical issue of fire duration. Part II reviews the evidence of fire experts at trial and then the post-conviction

case, applies the law governing ineffective assistance claims to those facts, and finally addresses the majority's critiques of the new evidence.

I.  *The Murder and the Fire*

A.  *Timing*

The case against Bradford was circumstantial. No one witnessed Tamara Lohr's murder, and no physical evidence linked Bradford to her death. Yet Bradford was an obvious suspect. He and Lohr had been having an affair. Bradford's wife had learned of it, and he had recently decided to end it. Lohr responded with emails threatening to tell Bradford's wife the affair was continuing. Making things worse for himself, Bradford tried to delete some of those angry emails a couple of hours after the discovery of Lohr's body.

But undisputed facts from the prosecution's own case make it impossible that Bradford could have murdered Lohr and set the fire in her bedroom. Those undisputed facts confine the State to a theory that ultimately collapses from internal contradictions about the timing and intensity of the fire.

Bradford visited Lohr for a few minutes on the evening of August 1, 1992, leaving around 10:20 p.m. to start his night shift as a police officer. Lohr was alive when he left. She talked with her father by telephone between about 10:25 and 11:00 p.m. The next morning, when the fire department arrived at her home just after 6:30 a.m., her bedroom was ablaze and Lohr was dead. She had been murdered before the fire began, stabbed 21 times. Gasoline had been used as an accelerant.

Bradford's movements that night and morning provide the first of the facts that confine the State's theory. After leaving Lohr's house around 10:20 p.m., he reported for patrol

duty on the night shift, starting at 10:30, while Lohr was on the phone with her father. From then until 6:34 the next morning, Bradford was on patrol and accounted for, with one notable exception. Between 11:06 p.m. and 12:11 a.m., there was a gap in his activity log for the night. That would have been his only opportunity to commit the murder. The rest of the night, he was busy with patrol duties until his shift ended.[1]

The timing of the fire and Bradford's movements in the morning is critical. The State's case rested on the theory that Bradford had not started the fire until the morning, just minutes before firefighters extinguished it. We know Bradford left work about 6:30 a.m. and headed for Lohr's house. A bank's ATM camera a few blocks away from Lohr's home camera captured an image of Bradford's car passing the bank at exactly 6:34:04 a.m.[2]

Just 65 seconds later, at 6:35:09 a.m., Bradford was at Lohr's house calling for a fire truck and ambulance. Less than a minute after that, at 6:36:07 a.m., two runners two blocks away saw a column of smoke from the house rising above the treeline—smoke they described as "real thick," and "very dark, black looking, and so thick." Police and fire arrived at

---

[1] The majority claims that Bradford "appears to have concealed his whereabouts on the fatal night." If he had known he would want an alibi, I expect he would have done a better job of manufacturing one. Bradford's activities in those 65 minutes were hotly disputed at trial, but my focus is on the duration of the fire, even assuming that his alibi evidence for those 65 minutes need not be believed.

[2] This time and the others presented in the evidence were all synchronized to ensure exact comparisons of times from different systems, such as the ATM camera and the police and fire dispatch systems.

6:38:30 and 6:38:49 a.m., respectively. The fire was extin-
guished no later than 6:43:19 a.m. An empty gas can was un-
der Lohr's bed where her body lay.

Later the day of the fire, an investigator used an electronic
"sniffer" to check Bradford's uniform and shoes. They
showed no signs of gasoline or other accelerants. Nor was
there any blood on his uniform. Police officers who were close
to Bradford at the scene noticed he smelled of smoke but not
gasoline. That was consistent with Bradford's report that
when he arrived, he went into the house but it was so full of
smoke that he was unable to reach Lohr's bedroom.

B. *The State's Theory*

The undisputed timing evidence left the State with a the-
ory that seems unlikely on first reading. According to the
State, a police officer planned and carried out a scheme—
while on patrol duty and subject to calls at any moment dur-
ing a busy Saturday night shift in high summer—in which he
returned to Lohr's house between 11:00 p.m. and midnight,
murdered her by stabbing her 21 times, and then carefully ar-
ranged the premises to fake a break-in and made preparations
to start a fire in a return visit. The State's theory is that Brad-
ford then returned to work (in a clean uniform, no less),
worked the rest of his shift, behaving professionally and ex-
hibiting no unusual behavior toward anyone he encountered,
and then returned to the scene of the murder just after 6:30
a.m. both to start the fire and to call it in just seconds later.

On further scrutiny, this theory becomes even less likely. It
requires that Bradford, in no more than about 45 seconds, en-
countered a neighbor who he knew would recognize him,
walked calmly into Lohr's house, poured gasoline over her

body, the bed, and the floor, lit a fire, and then left the house and immediately called the fire department.[3]

Why would a police officer use a plan that required him to make a second visit to the scene of the murder and ensured he would be there when Lohr's body was discovered? Why make that second visit late enough in the morning that a number of neighbors would be awake and out on streets and sidewalks and able to place him there, supposedly before there was any sign of a fire? If the fire was meant to conceal the murder, why not light it at night, during the first visit, when he had at least an arguable alibi, and when the fire would have had a much better chance of going undiscovered long enough to destroy significant evidence?

Despite these problems, this had to be the State's theory to convict Bradford. Yet murder cases can involve strange behavior, even if it seems improbable. Those problems with the theory make it implausible but do not quite disprove it.

C. *Physical Evidence of the Fire*

The physical evidence of the fire, however, finishes the job of refuting the State's theory. Under that theory, the fire could have burned no more than eight and a half minutes after Bradford supposedly started it. It also would have had to generate a heavy column of smoke visible from two blocks away no more than 90 seconds after ignition.

---

[3] The time between Bradford's appearance on the bank camera and the call to emergency services was 65 seconds. A detective testified that completing the drive from the bank would have taken 18 to 23 seconds, leaving about 45 seconds to complete all the other tasks.

Investigators found many clues to the duration of the fire. The fire had been confined to Lohr's bedroom, as shown by the only minor damage to areas outside the bedroom. Critically, the bedroom door had been open just about one inch during the fire, prevented from closing entirely by a clothes hanger. Paint at the top of the door frame had been protected by the door, showing that it had remained nearly closed during the fire.

Within the bedroom, the fire caused extensive damage. Lohr's foam mattress had been entirely consumed. Yet the room had not gone into "flashover"—when the upper layer of gas in a room becomes hot enough to ignite all available combustible surfaces. The room had two windows: the front bedroom window, made up of twelve glass panes, was intact. (A140) The side window had been shattered by firefighters' efforts to access the bedroom, but one firefighter testified that only one of its panes had had a few long cracks in it before that occurred. (Tr. 976–68) Even the wooden dividers separating the panes were still intact. (Tr. 1955)

The upper panel of the bedroom door had charred through from ambient heat, as had a similar closet door. That hole in the panel of the bedroom door allowed smoke from the bedroom to escape through that gap, and then up through an open hatch to the attic. Until the door charred through, no significant amount of smoke would have escaped the bedroom. Until that happened, there was no way for enough smoke to accumulate in the attic to cause a thick smoke plume and to seep from the house's eaves.

No witness, lawyer, or judge has offered a plausible theory as to how the door could have charred through and the fire produced a heavy column of smoke within 90 seconds after

Bradford entered the house. The fire simply could not have done so much damage to the bed and to the bedroom door in the available time. Even to approach those short times, the fire would have left unmistakable signs of much higher temperatures and a flashover fire in the bedroom, which did not happen. In short, no one has offered a plausible account of the timing and physical evidence that supports Bradford's convictions.

II.  *The Claim for Ineffective Assistance of Counsel*

The fire's duration has always been the pivotal issue in the circumstantial case against Bradford. If the fire burned longer than eight and a half minutes, then it does not matter whether he might have had a motive to kill Lohr or that he tried to delete emails about the affair or that the able prosecutor scored some effective points in cross-examining him. If the fire began before 6:34 a.m., Bradford could not have been the arsonist—full stop.

The failure of Bradford's lawyers to identify and call an appropriate expert on fire duration amounted in this case to ineffective assistance and led to an unreliable verdict. To show the ineffective assistance, I review in Part II-A the expert evidence about the fire at trial, in II-B the expert evidence Bradford offered in the post-conviction case, in II-C the applicable law, and in II-D the majority's criticisms of the post-conviction expert evidence.

A.  *Fire Experts at Trial*

The prosecution called Jesse Storey, an investigator for the Evansville Fire Department. He opined that the fire as a whole lasted a total of seven to ten minutes (Tr. 1993), nicely bracketing the maximum eight-and-a-half minutes allowed by the

State's theory. Storey also said the door would have charred through in two to three minutes. (Tr. 2018) He did not explain the basis for his char-through estimate. He also claimed that smoke would have been visible from outside the house within a minute of ignition. (Tr. 1990) If that were true, it might help explain away the runners' testimony. The problem is that neither Storey nor anyone else has offered an explanation for that claim, let alone any quantitative basis for it, keeping in mind that the bedroom door was nearly closed and remained intact during that time, according to Storey himself.

The defense called Barker Davie, a well-regarded forensic chemist and fire investigator. He was an expert on the causes and origins of fires, including cases of arson. In this case, though, there was no doubt about the cause or origin. Timing was the issue. Despite his other abilities, Davie was not able to provide the needed expertise on that issue.

Davie described the behavior of the fire in qualitative terms, testifying that the fire would have burned intensely at the beginning due to the gasoline, would have died down as the oxygen in the nearly closed room was consumed with little ventilation to supply new oxygen, and then would have flared up again once there was a new source of air—i.e., after the door panel charred through. He also testified about the quality of the smoke the fire would have produced and the path the smoke would have taken. Davie testified that the smoke would have escaped the bedroom, first through the crack in the slightly open bedroom door and then, in greater amounts, through the hole in the door after it charred through. It would have risen through the open scuttle hole into the attic and exited through the roof vent. Eventually, he testified, as the fire continued to burn and more smoke built

up in the attic, the plume would have become visible above the roof line; smoke might also have begun to seep from beneath the eaves if it had built up to such a degree that the roof vents could no longer provide sufficient egress.

On the critical matter of timing, however, Davie was not able to offer any reliable quantitative analysis—not for the door to char through or for smoke to become visible. When asked about the time to char through, he offered only an estimate based on the National Fire Protection Association "international rule of thumb" that "wood will char and burn at the rate of roughly one inch in forty-five minutes time frame." (Tr. 3085) Davie used that rule of thumb to estimate a char-through time of between seven and ten minutes for this door panel about 5/16" thick. (Tr. 3086) As for seeing smoke, Davie said he could not estimate "how long and what range of time it would be before smoke would be clearly visible from the outside of the house." (Tr. 3088) Instead, he relied on the fact that the two runners had seen a heavy column of smoke as early as 6:36:07 a.m., just two minutes after Bradford passed the bank camera on his way to Lohr's home. Because generally smoke takes time to build up, he testified, it would be "highly improbable" that the smoke would be visible "in the first minute or two of that fire." (Tr. 3091; 3099–3101)

When asked for an opinion as to the fire's earliest possible starting time and the range the fire could have burned, Davie was unable to offer an estimate based on the physical evidence at the scene. Instead, he based his estimate on the testimony of Gerald Johnson, a newspaper carrier who testified he smelled smoke in front of Lohr's home during his paper route. Johnson described hearing fire alarms later that morning and estimated he had smelled smoke seven and a half to ten

minutes earlier than that. Bradford's call was fixed at 6:35:09 a.m., so with an estimated alarm time of 6:36, Johnson would have smelled smoke between 6:26 and 6:29 a.m., five to eight minutes before Bradford drove past the bank. Davie also testified that the smoke would not have been perceptible for about two to five minutes after the fire started, because time was required for the smoke to build in intensity, pushing the ignition time even earlier. (Tr. 3122)

On cross-examination, Davie was asked to ignore the witness testimony and to provide an estimate, "based upon the physical evidence," as to the minimum amount of time the fire would take. He responded:

> Based just solely on the physical evidence and nothing else that door frame could burn at the rate of one inch in forty-five minutes time frame with constant direct flame impingement and that would take on the order of about eleven minutes to do that. (Tr. 3227)

That opinion was "[s]olely based on just looking at that door excluding everything else and that's the only piece of physical evidence that I know of right now that's present here that would help give you a gauge." (Tr. 3228)

Davie had made a critical mistake that undermined his credibility. In rebuttal the State called Donald Johnson, a Special Agent with what was then the federal Bureau of Alcohol, Tobacco and Firearms. He testified that Davie's "rule of thumb" was "no longer considered to be a rule or a standard." He cited NFPA Publication 921, which was released in 1992 and rejected Davie's "rule of thumb":

> 4-5.2* Rate of Charring. The depth of char meas-
> urements should not be relied on to determine
> the duration of the burning. The rule of 1 in. in
> 45 min for the rate of charring of pine is based
> on one set of laboratory conditions in a test fur-
> nace. Fires may burn with more or less intensity
> during the course of an uncontrolled fire than
> under a controlled laboratory fire. Actual labor-
> atory char rates from exposure to heat from one
> side vary from 0.4 in. per hr at 750°F (390°C) to
> 10 in. per hr at temperatures approaching
> 2000°F (1090°C) in intense fires. Even these fig-
> ures will vary with the species of the wood, ori-
> entation of the grain, moisture content, and
> other variables. Charring rate is also a function
> of the velocity of hot gases and the ventilation
> conditions. Fast moving gases or ventilation can
> lead to rapid charring.

Donald Johnson's testimony wholly undermined Davie's and the defense's only analysis of the physical evidence to find the fire duration, which had been based on an obsolete standard that had been disavowed more than a year before trial.

Johnson also disagreed with Davie's seven- to eleven-mi-nute estimate of the char-through time for the door. Johnson testified that the door would have charred through in three to four minutes, though he did not offer any empirical basis for that estimate. (Tr. 3818–19)

Davie's reliance on the discredited "rule of thumb" left Bradford with no credible expert testimony on the timing of the fire. Instead, all he had was the imprecise and unreliable

testimony of the newspaper carrier, Gerald Johnson.[4] The State made this point several times in closing. Here was the most telling attack:

> [Y]ou could boil down [Davie's] hours of testimony to this: that if Gerald Johnson smelled smoke coming from Tammy Lohr's bedroom and if that smoke was part of the fire that burned down her bedroom and burned her body and if that smell of smoke happened before Patrick [Bradford] got there then Patrick Bradford didn't set the fire. Well, you don't need to pay someone a hundred and twenty-five dollars an hour to tell you that. (Tr. 3950–51)

See also Tr. 3938, 3943. The attacks were right on target. On the critical issue of fire duration, Davie simply did not provide expertise that helped the defense.

B.  *Expert Evidence in the Post-Conviction Case*

Bradford was convicted of the murder and arson, and his convictions were affirmed. *Bradford v. State*, 675 N.E.2d 296 (Ind. 1996). He sought post-conviction relief. After years of delay, the state court held an evidentiary hearing in 2011. Bradford presented a number of claims, but I focus on the scientific evidence he presented to show that the fire could not have developed as the State had claimed to show his guilt.

---

[4] As the State pointed out in closing, Johnson testified that the smoke smelled like burning wood, which is not the smell the foam mattress—the primary source of fuel—would have given off. Johnson also said that he had been "convinced" the smoke smell was coming from behind the house, not Lohr's bedroom; otherwise, he would have called in an alarm.

Bradford offered the testimony of Douglas Carpenter, a fire protection engineer. Carpenter did what Davie and the State's experts had failed to do for the original trial: he provided a quantitative analysis, rooted in science and the physical evidence, of the duration of the fire.

Carpenter's report described flashover (when hot gases reach a high enough temperature to ignite all available combustible surfaces in a room). Generally, the upper layer temperature must be about 500° to 600° Celsius (about 930° to 1100° Fahrenheit) for this to occur, which corresponds to a heat flux of 20 kilowatts per square meter at floor level. Physical evidence shows that flashover did not occur. (A120–21)

Carpenter set out to estimate how long it took for the door panel to char through in non-flashover conditions, and how long it would have taken, based on the known conditions of the fire. First, he analyzed the significance of the smoke plume rising from the attic and the smoke seeping from beneath the eaves. Carpenter, like both the State's experts and Davie, recognized that the fire was "ventilation limited"—that is, limited by lack of oxygen, not lack of fuel—before the door charred through. The nearly closed bedroom door meant that the oxygen in the bedroom was used quickly and could not be replaced with fresh air.

According to Carpenter, the flow of smoke out of the bedroom also would have been minimal before the door charred through because the smoke had so little space to escape. There would have been no appreciable smoke accumulation in the house or attic before the door charred through. Without accumulation outside the bedroom, there would have been no visible smoke column or smoke leaking from beneath the eaves. The little smoke that escaped the room would have risen to

the attic and exited through the small roof vents without significant accumulation in the attic. (A126–27)

After char-through, however, the dramatic increase in area of the outflow openings (from 0.06 square meters with a one-inch bedroom door gap, to 0.80 square meters after char-through) meant that the smoke could no longer be vented in full by the roof vents. Char-through would have led to smoke accumulation in the attic, which would in turn have led to the heavy smoke plume that the runners saw at 6:36 a.m.

Carpenter then turned to the time for the door to char through. Recall that the State's experts at trial had estimated just two to four minutes, though without offering any quantitative basis. Carpenter, however, obtained exemplar doors from Lohr's house. He conducted experiments by exposing samples of the door panels to a range of thermal heat fluxes (between 12 and 20 kW/m$^2$) and recording the char-through times. (A137–38) At 20 kW/m$^2$, which corresponds to an upper layer temperature of about 350° Celsius (660° Fahrenheit), the panel took an average of 11 minutes and 33 seconds to char through—three minutes longer than the maximum *total* duration of the fire, according to the State's theory.[5]

For these figures to matter, Carpenter needed to determine the heat flux actually produced by the fire in Lohr's bedroom. To do this, he considered the front window in the bedroom,

---

[5] Carpenter's estimate of char-through time is consistent with data in the new NFPA 921 standard, which notes a char-through rate of 0.4 inches per hour at a temperature of 750° Fahrenheit, or about 400° Celsius. PCR Tr. 198. The bedroom door was about 0.3 inches thick (5/16 of an inch), and the heat on the door could not have reached anything close to 750° Fahrenheit in light of the lack of glass breakage.

which contained twelve individual glass panes. None broke, though one pane in the side window might have cracked during the fire. Relying on data from a study that estimated the probability of three-millimeter glass breakage as a function of hot temperatures, he estimated that the upper layer temperature would have been about 280° Celsius (540° Fahrenheit), corresponding to a heat flux of 16 kW/m². At 280° Celsius, the probability of glass breakage is about one in twelve. Because none of the twelve panes broke, Carpenter estimated that the temperature had to be 280° or below, corresponding to a char-through time of about 30 minutes.

Carpenter also considered the mattress in Lohr's bedroom, which was the principal fuel for the fire after the gasoline burned off. The mattress was entirely consumed by the fire. "If the amount of combustible mass (in units of kg) and the mass loss rate (in units of kg/sec) are known, then an estimate of the duration of the fire (in units of seconds) can be obtained." As noted, before the bedroom door charred through, the fire was ventilation-limited, not fuel-limited, thanks to the nearly closed bedroom door and the lack of another oxygen source. Carpenter estimated that the mattress included about 20 kilograms (about 44 pounds) of combustible polyurethane foam. (A143) According to a model for fire behavior widely accepted by fire experts—Consolidated Fire and Smoke Transport (CFAST)—with enough ventilation, burning such a mattress would produce so much heat that a fire in an average-sized bedroom would proceed to flashover, which did not occur in this case. Thus, Carpenter concluded, the mattress had been consumed entirely *before* the door charred through and allowed more oxygen into the room. (A145–46)

Available data showed a mass loss rate on the order of one gram per second for flexible polyurethane foam in a closed-door fire. (A147–48) Since the door was slightly ajar here, Carpenter used the CFAST model to predict a faster mass loss rate of about three grams per second for a fire in a bedroom with a door open approximately one inch. That produces a rough estimate of a two-hour fire to consume the entire mattress with the door an inch ajar. Carpenter used this figure to estimate an outer bound for the fire's ignition time. Combining the independent data from the glass that did not break, the char-through experiments, and the mattress, he estimated that the fire had to have been set between 4:30 a.m. and 6:00 a.m., well outside the time when Bradford could have been responsible. The undisputed testimony of the runners who saw a smoke column from two blocks away at 6:36, which the majority does not mention, provides independent corroboration of Carpenter's analysis.[6]

### C. *Ineffective Assistance of Counsel*

To show ineffective assistance of counsel, a defendant must show (1) that counsel's performance was constitutionally deficient, and (2) that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Bradford has made both showings here.

#### 1. *Deficient Performance*

Deficient performance means that counsel's representation "fell below an objective standard of reasonableness." *Id.*

---

[6] The parties have also debated Carpenter's assertion that the concentration of carbon monoxide in Lohr's dog's blood proved that the fire had burned longer than eight minutes. There is enough controversy about the reliability of that analysis that I do not rely on it here.

at 688. A court's after-the-fact scrutiny of counsel's perfor-
mance must be deferential to avoid hindsight and to recog-
nize that a decision may be a matter of strategy. *Id.* at 689. If
counsel's performance overall reflected "active and capable
advocacy," establishing a claim for ineffective assistance of
counsel is and should be difficult. *Harrington v. Richter*, 562
U.S. 86, 111 (2011). It is not impossible. In some instances,
"'even an isolated error' can support an ineffective-assistance
claim if it is 'sufficiently egregious and prejudicial.'" *Id.*, quot-
ing *Murray v. Carrier*, 477 U.S. 478, 496 (1986); see also *Williams
v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009).

The selection of an expert witness is ordinarily a matter of
strategy and difficult to challenge under the deferential stand-
ards of *Strickland* and 28 U.S.C. § 2254(d). The Indiana courts
concluded that counsel's selection of Davie was a reasonable
strategic choice. Davie had a good reputation in the fire inves-
tigation community, and he had never before testified for the
defense in a criminal case. *Bradford v. State*, 988 N.E.2d 1192,
1203–04 (Ind. App. 2013). We owe deference to the state
court's resolution of the claim as well as to counsel's strategic
decisions.

Crucially, though, in a failing the state courts did not rec-
ognize, Davie was unable to offer a credible expert opinion on
the one question that mattered the most: whether it was phys-
ically possible for Bradford to have set the fire. And such ex-
pertise was available at the time of trial, using the information
and techniques later used by Carpenter.

By Davie's own admission, he recognized only a single
piece of physical evidence (the door) that could help him es-
timate the fire's duration. He apparently did not appreciate
the importance of the intact windows and the fully consumed

mattress. And rather than carry out an experiment on char-through time, he just relied on the obsolete "rule of thumb" that had been discredited more than a year before the trial.

On the fire's duration, Davie was equivalent to no expert at all, as the prosecutor showed during closing. We and other circuits have found deficient performance before where counsel fails to present expert evidence on a question so critical to the prosecution's case and his client's defense as the fire duration was here. E.g., *Thomas v. Clements*, 789 F.3d 760, 769–70 (7th Cir. 2015) (effect of counsel's failure to reach out to expert "was to accept [prosecution expert's] finding of intentional death without challenge and basically doom defense's theory of the case"); *Woolley v. Rednour*, 702 F.3d 411, 423 (7th Cir. 2012) (failure to present rebuttal expert where State expert's testimony "effectively hollowed out the core" of defense and "went to the heart of whether [defendant's] version of the shootings was physically possible"); *Richey v. Bradshaw*, 498 F.3d 344, 362–64 (6th Cir. 2007) (deficient performance where scientific testimony was critical to State's specific theory and defense counsel hired an expert but failed to consult with him, while other experts would have "severely undermined the State's case"); *Dugas v. Coplan*, 428 F.3d 317, 328–31 (1st Cir. 2005) (importance of challenging State's arson case, crucial role of arson evidence, and attorney's awareness of problems with the State's case all demonstrated "inescapable need for expert consultation in this case"); see also *Rogers v. Israel*, 746 F.2d 1288, 1294 (7th Cir. 1984) ("under certain circumstances, 'it may be vital in affording effective representation to a defendant in a criminal case for counsel to elicit expert testimony rebutting the state's expert testimony'"), quoting *Knott v. Mabry*, 671 F.2d 1208, 1212–13 (8th Cir. 1982).

For a single error to qualify as ineffective assistance, it must be sufficiently egregious and prejudicial—"an omission of something obviously better (in light of what was known at the time) than the line of defense that counsel pursued." *Williams*, 557 F.3d at 538. Scientific testimony that exonerates a defendant surely fits that bill, so long as it was "known at the time."

On that critical point, the state trial court concluded after the post-conviction hearing that "Carpenter provides only a new opinion on the same evidence that was available at the time of trial." The court also found that "the theories and factors upon which [Carpenter] based his calculations were known or with some work could have been calculated – and were therefore discoverable by due diligence – at the time of trial." The Indiana Court of Appeals agreed. *Bradford v. State*, 988 N.E.2d at 1199–1200.

That reasoning convinced the state courts that Carpenter's evidence did not qualify as "new" evidence to justify a new trial. But that reasoning is also critical on the issue of ineffective assistance. The State cannot have it both ways. Bradford's bid for a new trial was rejected because the information and analysis Carpenter has offered was available at the time of trial. His otherwise capable counsel should have recognized such quantitative expertise as obviously better than the weak and equivocal duration testimony that Davie provided. As the prosecutor correctly pointed out more than once, that testimony was not based on expertise at all.

### 2. *Prejudice*

As for prejudice, to be entitled to habeas corpus relief, Bradford must show it is reasonably likely that but for counsel's error, the result of the proceeding would have been different. *Harrington*, 562 U.S. at 111. The likelihood of a different result has to be "substantial, not just conceivable," *id.* at 112, citing *Strickland*, 466 U.S. at 693, though Bradford need not show that the error more likely than not altered the outcome in the case. *Id.* at 111–12; *Stanley v. Bartley*, 465 F.3d 810, 814 (7th Cir. 2006) (petitioner's chance of being acquitted need not be 50 percent or greater); see also, e.g., *Thomas v. Clements*, 789 F.3d at 772 (finding prejudice where it was "substantially likely that [petitioner] could have raised at least a reasonable doubt and had a different outcome at trial"). Essentially, the errors must be serious enough to undermine confidence in the outcome. *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011), quoting *Strickland*, 466 U.S. at 694. The state courts did not reach the issue of prejudice.

Bradford easily satisfies the prejudice requirement. No reliable scientific evidence on fire duration and char-through time was offered at trial—not by Storey, not by Johnson, and not by Davie. The bank camera drew a bright line at 6:34 a.m. If the fire started earlier than that, Bradford did not light it. If counsel had presented Carpenter's analysis on duration and if that evidence was scientifically valid, a reasonable jury could not have found Bradford guilty. At the very least, Carpenter's analysis undermines confidence in this verdict.[7]

---

[7] Bradford recognizes how difficult it is to obtain federal habeas relief from a state conviction on a theory of ineffective assistance of counsel. He

D.  *The Majority's Critique of Carpenter*

Carpenter's scientific analysis showing that Bradford could not have set the fire was unscathed by cross-examination in the state courts. The prosecutor focused on trying to show that another expert could have done the same sort of analysis at the time of trial. That is also my point, of course, for it is key to showing the ineffectiveness of relying on Davie. The prosecution tried a few substantive attacks, such as trying to show some uncertainty about the thickness of the window glass, how similar the door samples were for the char-through experiments, and the exact size of Lohr's mattress. Carpenter easily parried those, showing why his estimates were reliable and/or that minor changes in the variables would not change the bottom line conclusion. Not surprisingly, then, the state trial and appellate courts did not try to engage Carpenter's analysis on the merits. In this federal appeal, we find the first attempt by a court to engage Carpenter on the merits. The majority offers some new criticisms based on its own research. None of those criticisms are serious enough to undermine the key conclusion.

---

has also argued that this would be an appropriate case to decide whether the federal constitutional guarantee of due process of law should support an independent claim for relief based on only actual innocence, without any other constitutional violation. See *House v. Bell*, 547 U.S. 518, 554–55 (2006) (question remains open); *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (threshold for such theory would be "extraordinarily high"); *id*. at 442 (Blackmun, J., dissenting) (petitioner would need to show he "probably is innocent"). In my view, Bradford has shown that he is probably, in fact almost certainly, innocent. The only reasons I hedge at all on his innocence are (a) I am not a fire expert and (b) no true expert has tried to rebut Carpenter's analysis. Perhaps he is mistaken, but no one has shown that yet.

The majority's most telling point is that Carpenter's analysis of the probability of glass breakage was wrong, and I agree with the point. A one in twelve probability that a pane of glass will break does not mean that in twelve separate, independent events, one will certainly break. (In simpler terms, if you flip a coin twice, the probability of heads is one-half on each flip but there is no guarantee that one of two flips will turn up heads.) Carpenter also did not explain why all twelve panes might have been exposed to approximately the same heat flux, given that heat rises. He also could not be sure that the glass in Lohr's bedroom windows was three millimeters thick, though there is no evidence of non-standard glass in this small and modest home. And so on.

The prosecutor did not challenge Carpenter on the probability of the window panes remaining intact. The data in Carpenter's report show that the probability of breakage rises dramatically after about 275° Celsius (530° Fahrenheit). By the time the temperature reaches about 350° Celsius (660° Fahrenheit)—which is not hot enough to produce a char-through time of eight and a half minutes based on Carpenter's tests—the probability of glass breakage rises to about 0.6. (A140) If each of the twelve panes had an independent six in ten chance of breaking, the probability that none would break would be $(4/10)^{12}$, or $1.677 \times 10^{-5}$—less than two in a hundred thousand. Also, the data refer to glass *breakage*, meaning that pieces of the glass fall out, further ventilating the fire. Babrauskas, cited by the majority, also says it is fairly well-established that a windowpane of ordinary float glass "tends to crack when the glass reaches a temperature of about 150–200°C." Carpenter's report indicates that the front bedroom window "showed no signs of cracking." (A138)

In other words, even if we correct the error in Carpenter's probability analysis of the glass, the State still cannot explain how, if the fire burned hot enough to char through the door fast enough to support its theory, all of the front windowpanes remained unbroken.

More fundamental, most of the majority's critiques were not even raised during the cross-examination of Carpenter at the post-conviction hearing. Carpenter never had the opportunity to expand upon his reasoning, to defend his work, or, if there was in fact a significant error, to explain why it might or might not affect his ultimate conclusion.

For example, at page 6, above, the majority attacks Carpenter for having confused floor- and ceiling-level heat flux during his testimony. That apparent error seems to have been limited to his testimony at the hearing. His report did not make that mistake, nor were the report's overall conclusions based on it. His report makes clear that his estimate of the char-through time is based on the intact glass. (A138) It is not unusual even for experts (and lawyers and judges) to misspeak occasionally in such ways. The questioning prosecutor did not identify the point or ask for an explanation.

The majority also criticizes Carpenter for failing to explain why, since heat rises, all the windowpanes would have been exposed to the ceiling level heat flux. One could just as easily say it is not clear why the entire door panel from top to bottom would have been exposed to the ceiling level heat flux, given that the door, like the window, extended down from the ceiling into what were presumably slightly cooler temperatures. More to the point, Carpenter simply was not asked to justify his assumption. We do not know why he made it, whether it

was appropriate, or whether changing it would have a significant effect on his conclusion.

In contrast, one such critique was raised on cross-examination—Carpenter's assumption that the window was made of plain three-millimeter glass. He parried the attack easily, noting that tempered glass "isn't traditionally used in residential situations," and that three millimeters is a typical thickness. This seems a reasonable explanation to me, and it suggests Carpenter may well have been able to rebut the majority's other critiques if he had been asked about them.

Carpenter's evidence is not perfect. It depends on certain assumptions and estimates, both because of the passage of time and because the behavior of an uncontrolled fire can be difficult to pin down. But his evidence is powerful. It is the only analysis of the fire's duration based on empirical data, derived from actual tests instead of conjecture, obsolete rules of thumb, or inexact witness guesstimates. His analysis is quantitative and testable. His results appear to be so definitive that minor adjustments for surprisingly thick glass or having the bedroom door open a little farther could not solve the basic problems with the State's theory.

To cause the physical damage within the State's eight-and-a-half-minute maximum burn time, the fire would have had to have been much more intense, consuming the entire mattress in just a few minutes and resulting in broken windows and the flashover that the experts agree never happened. And there is no plausible explanation how the fire in the nearly closed bedroom could have produced, in no more than 90 seconds, a heavy smoke plume visible to the runners more than two blocks away. To explain that smoke plume at all, the char-through time would need to be measured not in minutes but

in seconds. And that would mean in turn that the fire would have been ventilated almost from the beginning, contrary to all the fire experts' views, and it would have reached flashover, which did not happen.

If we are going to apply our own analysis to Carpenter's analysis, we also should not close our eyes to the grisly report from Dr. John D. DeHaan, which focuses on the fire damage to Lohr's body. His analysis, based on the autopsy report and tests that have been done by exposing human cadavers and the bodies of other animals to flames, corroborates Carpenter. DeHaan found that the heavy fire damage to Lohr's body was inconsistent with a fire of only five to seven minutes and was "much more consistent with a fire exposure of approximately 20 minutes to direct flames"—or perhaps to a much longer fire, one of reduced intensity due to the ventilation limits on the fire in this case. (A179)

\*   \*   \*

To sum up, even if Carpenter's analysis has a couple of minor errors in it, his analysis is the only analysis of the fire's duration with a scientific and empirical basis. His conclusion appears sound, and the State did not show otherwise. If it is correct, it exonerates Bradford. In a new trial, the State would have the chance to attack the scientific analysis on its merits. Perhaps the State would then be able to show that Carpenter's work is not to be trusted. Or perhaps it could present, finally, an expert who could explain in reliable scientific terms how a fire could have done the damage this fire did so quickly without leaving unmistakable signs of a much hotter fire.

Given the state court's conclusion that the analysis Carpenter provided was available at the time of the original trial,

No. 15-3706            37

I would treat the failure to seek and find such critical expert evidence as ineffective assistance of counsel. In the alternative, I would treat this case as appropriate for an actual innocence grant of habeas corpus. We should order issuance of a writ of habeas corpus directing that Bradford be released or retried.